**Stephen R. RATCLIFF, Connie L. Ratcliff, Prairie Production, Inc., and Battleground Hybrids, Inc., Appellants–Plaintiffs,**

v.

**CITIZENS BANK OF WESTERN INDIANA and Dan J. Fehrenbach, Appellees–Defendants.**

No. 79A05–0109–CV–393.

Court of Appeals of Indiana.

May 29, 2002.

R.C. Richmond, III, Sommer & Barnard, Indianapolis, IN, Attorney for Appellants.

Lawrence R. Wheatley, Danville, IN, Attorney for Appellees.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Stephen and Connie Ratcliff, Prairie Production, Inc., and Battleground Hybrids, Inc. (collectively the "Ratcliffs") appeal the trial court's grant of a motion to dismiss in favor of Citizens Bank of Western Indiana (the "Bank") and Dan J. Fehrenbach (collectively, the "defendants") on the Ratcliffs' multi-count civil complaint. The following two consolidated issues are dispositive of our review:

1. Whether the trial court erred when it determined that the Ratcliffs' claims were barred because they failed to file them as compulsory counterclaims in a prior foreclosure and receivership action.

2. Whether the Ratcliffs' claims are barred by Indiana Code Section 34–48–4–5.

We affirm.

## FACTS AND PROCEDURAL HISTORY

Stephen and Connie Ratcliff are married and live in West Lafayette, Indiana. Collectively, they own and operate two corporations, Prairie Production, Inc. and Battleground Hybrids, Inc., which deal with the production, wholesaling, and retailing of seed corn. Beginning in 1994, the Bank[1] through its president, Dan J. Fehrenbach, loaned the Ratcliffs money to finance their home and run their farming operations. Crop yields for 1995 were very poor, and the Ratcliffs suffered substantial losses. Nevertheless, Fehrenbach recommended that the Ratcliffs double their acreage of seed corn for the 1996 crop year, that they purchase a second processing plant to bag the seed, and that they sell the additional seed to Hubner, a company specializing in seed corn retailing. Fehrenbach assured the Ratcliffs that the Bank would arrange for the necessary financing.

But as of July 1996, the Bank had not arranged financing for the purchase and renovation of the processing plant. As a result, Fehrenbach enlisted the help of Veedersburg State Bank,[2] which loaned the Ratcliffs enough money to purchase the processing plant, contingent on the Ratcliffs' agreement to take out a $900,000 loan to help finance the harvest of the 1996 crop. Fehrenbach promised the Ratcliffs and Veedersburg that the Bank would provide an additional $550,000 in financing so that the Ratcliffs could produce and harvest the 1997 crop, thus enabling the Ratcliffs to pay back their loans to the Bank, Veedersburg, and their other creditors. But the Bank never provided the promised financing, and the Ratcliffs ran out of money to harvest and process the 1997 crop, ultimately defaulting on their obligations to the Bank, Veedersburg, and other creditors.

In December 1997, the Bank rejected the Ratcliffs' request to restructure their loans and, instead, filed a "complaint for damages, foreclosure of mortgages, and replevin of collateral" seeking to recover the roughly $1 million it had lent to the Ratcliffs to purchase their home and finance their businesses. In March 1998, the trial court appointed a receiver to protect, preserve and liquidate the Ratcliffs' assets in order to satisfy their indebtedness. On October 16, 1998, the receiver filed his Final Report.

While the receivership was pending, on November 12, 1998, the Ratcliffs filed an original civil complaint for damages against the Bank and Fehrenbach for (1) breach of commitments to lend, (2) promissory estoppel, (3) breach of the obligation of good faith and fair dealing, (4) breach of fiduciary duties, (5) tortious interference with a business relationship, and (6) interference with prospective business advantage. Then, on or about December 9, 1998, the Final Report was approved and the court ordered the receivership closed without objection from any party.

In March 1999, the Bank and Fehrenbach filed a combined motion to dismiss, which the trial court treated as a motion for summary judgment upon motion by the Ratcliffs.[3] Following a hearing, the court granted the defendants' motion and dismissed all of the Ratcliffs' claims, concluding both that Indiana Code Section 34–48–4–5 forever barred their claims because they were assets subject to the receivership and that the Ratcliffs' claims were compulsory counterclaims that should have

---

1. The Bank is now called Fifth Third Bank.

2. Veedersburg State bank is now known as Centre Bank.

3. *See* Trial Rules 12(B) and 56.

been filed during the foreclosure and receivership proceedings. This appeal followed.

## DISCUSSION AND DECISION

### Standard of Review

Summary judgment is appropriate only if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C). In reviewing a grant of summary judgment, this court stands in the shoes of the trial court and applies the same applicable standard. *Progressive Constr. and Eng'g. Co., Inc. v. Indiana and Mich. Elec. Co., Inc.,* 533 N.E.2d 1279, 1282 (Ind.Ct.App.1989). We will affirm a grant of summary judgment if sustainable on any theory found in the evidence designated to the trial court. *Jacques v. Allied Bldg. Servs. of Indiana,* 717 N.E.2d 606, 608 (Ind.Ct.App.1999).

When the movant's affidavits and other evidence demonstrates the lack of a genuine issue, the burden shifts to the opposing party to demonstrate the existence of a genuine issue for trial. *Id.* Any doubt about the existence of a factual issue should be resolved against the movant, with all properly asserted facts and reasonable inferences construed in favor of the nonmovant. *Schrader v. Eli Lilly & Co.,* 639 N.E.2d 258, 261 (Ind.1994). The party appealing the grant of a motion for summary judgment bears the burden of persuading this court that the trial court erred. *Foster v. Evergreen Healthcare, Inc.,* 716 N.E.2d 19, 23–24 (Ind.Ct.App. 1999), *trans. denied.*

### Compulsory Counterclaims

The Ratcliffs contend that the trial court erred when it granted the defendants' motion to dismiss. Specifically, the Ratcliffs claim that the trial court erred as a matter of law when it found that their claims were actually compulsory counterclaims that

should have been filed during the earlier receivership proceedings. We must disagree.

Indiana Trial Rule 13(A) addresses compulsory counterclaims and provides, in pertinent part:

> A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, *if it arises out of the transaction or occurrence* that is the subject-matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction. . . .

(Emphasis added).

■■■ The phrase "transaction or occurrence" should be broadly defined so as to effectuate the rule's intended purpose of avoiding multiple lawsuits between the same parties arising from the same event or events. *Green v. Hendrickson Publishers, Inc.,* 751 N.E.2d 815 (Ind.Ct.App. 2001). Two causes of action arise from the same transaction or occurrence if there is a logical relationship between them, meaning that the counterclaim arises from the same aggregate set of operative facts as the opposing party's claim. *Hotmix & Bituminous Equip. Inc. v. Hardrock Equip. Corp.,* 719 N.E.2d 824 (Ind.Ct.App. 1999). When a party fails to file a compulsory counterclaim in the initial action, that claim is forever barred if the initial action has proceeded to judgment. *Id.; Crider v. State Exch. Bank of Culver,* 487 N.E.2d 1345, 1349 (Ind.Ct.App.1986).

Here, the Bank instituted foreclosure proceedings and an accompanying request for the appointment of a receiver after the Ratcliffs had defaulted on several personal and business loans. The trial court appointed a receiver who then liquidated the Ratcliffs' assets and distributed them to various creditors. The receiver eventually

issued his Final Report, which the court adopted without objection from the Ratcliffs.

In November 1998, the Ratcliffs filed a separate civil complaint against the Bank and Fehrenbach, charging, among other things, that the defendants had acted inappropriately in promising to lend them money and then reneging on that promise, which caused the Ratcliffs to default on their loans. In their complaint, the Ratcliffs detail a three-year relationship with the defendants that involved attempts to expand the Ratcliffs' business operations. Their complaint states, in part:

> Even though Prairie and Battleground had suffered substantial losses in 1995 ... Fehrenbach nevertheless recommended to Ratcliff that Prairie double its acreage of seed corn for the 1996 crop year, that a second seed processing plant be purchased to process and bag the additional seed corn, and that Prairie contract to sell the additional seed corn to Hubner. Fehrenbach promised [the Ratcliffs] that if the additional acreage was planted and the second seed processing plant was purchased, [the Bank] would arrange for the financing.

> * * * *

> Pursuant to and in reliance upon Fehrenbach's recommendation, and in reliance on Fehrenbach's promise that Citizens would arrange for the financing, Prairie increased its acreage of seed corn in 1996 from approximately 1,175 acres to approximately 2,475 acres, of which approximately 1,300 acres were placed under contract to Hubner, and Battleground contracted to buy a second seed corn processing plant in Windfall, Indiana.

> * * * *

> As of July, 1996, [the Bank] still had not arranged the financing to cover the purchase and renovation of the Windfall, as promised by Fehrenbach, and Fehrenbach and Salesman were concerned because Prairie and Battleground had no facility to process and bag the additional seed corn being grown for Hubner.

> * * * *

> Hubner [ ] offered to Ratcliff to advance to Prairie at a favorable interest rate the funds necessary to pay Prairie's employees and get the crop harvested and bagged.

> Upon information and belief, [the Bank] unreasonably and unjustifiably refused to grant its consent to allow Hubner to advance Prairie the funds necessary to get the crop harvested and bagged, and forced Hubner to instead propose an employment and lease arrangement with Prairie and Battleground on onerous terms dictated by [the Bank], including the imposition of a fee equal to 7½% of all expenses incurred by Hubner, plus interest at 10% per annum.

While the Bank eventually loaned the Ratcliffs some of the money and persuaded another bank to loan them additional funds, it was not enough to cover the expenditures that the Ratcliffs had incurred. As a result, the Ratcliffs ran out of money and eventually defaulted on their loans to several creditors, including the Bank, from which they had borrowed around $1 million between 1994 and 1996.

The Ratcliffs' complaint makes clear that the soured business relationship between the Bank and the Ratcliffs gave rise to the Ratcliffs' loan defaults and subsequent foreclosure proceedings as well as the Ratcliffs' civil claims against the Bank and Fehrenbach for failing to loan them the money as promised. In essence, the parties' relationship spawned several loans

and several promises by the Bank and Fehrenbach to make loans. The Bank's failure to deliver on its promises to lend caused the Ratcliffs to default on those loans that had been successfully executed. This interaction created a logical relationship or aggregate set of operative facts that spawned the foreclosure and receivership actions as well as the Ratcliffs' subsequent civil claims against the defendants.

We reached a similar conclusion in *Broadhurst v. Moenning*, 633 N.E.2d 326, 328–29 (Ind.Ct.App.1994). There, Gainer Bank held various debts secured by mortgages and guarantees on property owned by Broadhurst and his businesses. Broadhurst ran into financial difficulties, so Walter P. Moenning, acting as an agent for Gainer, entered into an agreement in which the Bank agreed to forgo its legal remedies in exchange for Broadhurst's taking a mortgage on certain property and then agreeing to attempt to sell that property to a third party. Moenning later approved a written agreement between Broadhurst and William Brown, in which Brown offered to buy the designated property. But Gainer first promised, then refused to finance a percentage of the purchase price. Brown grew skeptical of Gainer's practices and withdrew his offer to purchase. Gainer then foreclosed on Broadhurst's property. Afterwards, Broadhurst filed a separate complaint against Gainer and Moenning for, among other things, breach of contract and interference with contract resulting from the failed transaction with Brown. We con-

cluded that Broadhurst's claims and the prior foreclosure action had arisen out of the same transaction and occurrence. *Id.* at 332. We held, therefore, that Broadhurst should have filed his claims as compulsory counterclaims in the foreclosure action. *Id.*

▪ The Ratcliffs argue alternatively that even if their claims against the Bank were compulsory counterclaims, their claims against Fehrenbach, individually, must survive because he was not named as a party in the foreclosure action. But Trial Rule 13(A) does not limit compulsory counterclaims to only those individuals named in the original complaint; rather, a party is required to file a compulsory counterclaim that arises from the same transaction or occurrence against third parties over whom the court *can acquire jurisdiction.* The Ratcliffs do not demonstrate that the trial court could not have acquired jurisdiction over Fehrenbach had the Ratcliffs sought to join him as a party.[4]

▪ Once the receiver's Final Report was filed and approved by the trial court, the Ratcliffs' compulsory counterclaims were barred because the court's approval of that Final Report served as a final judgment. *State ex rel. Unemployment Compensation Bd. of Unemployment Compensation Div. v. Burton,* 112 Ind. App. 268, 44 N.E.2d 506, 508–09 (1942). The trial court did not err when it determined that the Ratcliffs' claims against the defendants were compulsory counterclaims that should have been filed during the foreclosure and receivership proceedings.

---

4. The Ratcliffs also allege that their claims as to Battleground were not compulsory counterclaims because Battleground was not named as a defendant in the foreclosure action. While that is true, they were certainly a party to the receivership proceedings because the receiver was appointed "as the [r]eceiver [] of the property and assets of Prairie, Battleground Hybrids, Inc .... and the Ratcliffs." Had Battleground been involved in these pro-

ceedings erroneously, the Ratcliffs should have objected long before Battleground's assets were seized, liquidated, and distributed by the receiver. Battleground submitted to the court's authority and to the receivership proceedings. It could have filed any counterclaim, couched as lender liability claims through the receiver, during those proceedings.

### Statutory Provision

The Ratcliffs next contend that the trial court erred when it determined that their claims were barred by Indiana Code Section 34–48–4–5. That section provides, in relevant part that "any objections or exceptions to the matters and things contained in an account or report and to the receiver's acts reported in the report or account that are not filed within the thirty (30) day period ... are forever barred for all purposes." Ind.Code § 34–48–4–5(b). The Ratcliffs did not file any objections or exceptions to the receiver's Final Report.

■ Nevertheless, the Ratcliffs contend that this section does not "bar claims." They argue that only objections or exceptions to the Final Report are barred, not the "matters and things" contained in, or in this case omitted from, the report. *Id.* Therefore, they allege, their claims here are not subject to the statutory restrictions. We must disagree.

Even before the non-claim statute, Indiana Code Section 34–48–4–5, it was the common law in Indiana that once the court approves a receiver's Final Report, it is conclusive as to the rights of the parties thereunder. Put another way:

> "[A] party to an action, in which a receiver has been appointed, must take notice of everything done in that action, including the final report filed by the receiver and his discharge as such.... A party properly brought into court is chargeable with notice of all subsequent steps taken in the cause down to and including the judgment."

*Flanders v. Ostrom,* 206 Ind. 87, 187 N.E. 673, 676 (1933) (holding court did not err when it denied motion to vacate judgment approving receiver's Final Report). With-out timely exceptions or objections to the receiver's Final Report, Indiana Code Section 34–48–4–5(b) bars the Ratcliffs from now raising issues that should have been included in that report.

The Ratcliffs argue alternatively that they were not required to file objections or exceptions under the statute because their claims were not capable of being resolved through the receivership. The trial court clearly found the opposite to be true, stating that "the [l]ender [l]iability [c]laims asserted in this consolidated [a]ction were assets of Prairie, Battleground, and the Ratcliffs and, as such, were subject to the receivership created by said orders." Further, the receiver listed in his Final Report several "remaining assets" and an appropriate disposition of those assets. Among those assets listed were "pending lawsuit[s]" against three different companies. *Id.* at 55–56. The Ratcliffs suggest that the instant claims are not subject to the receivership because they are not personal property. To the contrary, the unliquidated claims are choses in action—"rights that can be enforced by legal action (e.g., debts or causes of action in tort)." A Dictionary of Modern Legal Usage 153 (2nd ed.1995). And a chose in action is personal property. "In modern legal writing, chose = chattel personal." *Id.* The Ratcliffs further contend that the Bank cannot logically "hold as collateral claims against itself." This argument misses the point. The question is not what interest the Bank may have had in the Ratcliffs' claims, but whether the Ratcliffs' claims should have been administered in the receivership proceedings. The Ratcliffs do not distinguish their claims from the other claims listed as "pending lawsuits" in the receiver's Final Report, and the record provides no meaningful distinction.[5]

---

5.  All but one of the Ratcliffs' claims against the defendants are tort claims. Such claims, prior to July 1, 2001, were not subject to the

Bank's security interest under Article 9 of the Uniform Commercial Code, as codified in

The Ratcliffs' claims against the Bank and Fehrenbach were assets subject to the receivership. And Indiana Code Section 34–48–4–5 makes clear that they were required to file any objections or exceptions to the receiver's Final Report, which they failed to do. The trial court, therefore, did not err when it concluded that the Ratcliffs' claims were barred and granted the defendants' motion to dismiss.

Affirmed.

BAKER, J. and MATTINGLY–MAY, J., concur.

Indiana Code Section 26–1–9–104(k). Even if true, that does not absolve the Ratcliffs of their responsibility to list their claims as assets to be disposed of by the receiver. In its order granting the Bank's and Fehrenbach's motion to dismiss, the court, recounting its earlier March 23, 1998 order, stated that the "[r]eceiver had the authority to protect and preserve all the assets of Battleground and Prairie as well as the farm equipment, livestock, and other personal property used for and in connection with the farming business and operation of the Ratcliffs." Further, pursuant to a loan agreement, the Bank held a security interest in the Ratcliffs' assets, which included "claims against any corporation." While the receiver or the trial court could have decided to exclude the Ratcliffs' claims against the defendants from the receivership proceedings, the Ratcliffs cannot unilaterally exclude those claims from the receivership and then argue in a subsequent action that the receiver would not have been able to dispose of those assets. The receiver and the trial court that administered the receivership proceedings should have been given the opportunity to make that legal determination.