184 P.3d 106 (2007)
SKYLAND METROPOLITAN DISTRICT, a Colorado special district; and East River Regional Sanitation District, a Colorado special district, Plaintiffs-Appellees and Cross-Appellants,
v.
MOUNTAIN WEST ENTERPRISE, LLC, a Colorado limited liability company; and Daniel Gallagher, Defendants-Appellants and Cross-Appellees.
No. 04CA2605.
Colorado Court of Appeals, Div. II.
June 14, 2007.
*112 Bailey & Peterson, P.C., James S. Bailey, Jr., Randall M. Livingston, Denver, Colorado, for Plaintiffs-Appellees and Cross-Appellants.
Holland & Hart, LLP, Elizabeth A. Phelan, Boulder, Colorado, Meghan N. Winokur, Denver, Colorado, for Defendants-Appellants and Cross-Appellees.
Opinion by Judge LOEB.
Defendants, Mountain West Enterprise, LLC (Mountain West), and Daniel Gallagher (Gallagher) (collectively, the developers), appeal from the judgment enforcing statutory liens against their property in favor of plaintiffs, Skyland Metropolitan District (Skyland) and East River Regional Sanitation District (East River) (collectively, the districts). The developers also appeal those aspects of the judgment dismissing their counterclaims and awarding attorney fees against them. The districts cross-appeal various aspects of the judgment as well as the trial court's order approving the developers' supersedeas bond. We affirm in part, reverse in part, and remand with directions.

I. Facts and Procedural History
Skyland and East River are special districts, created pursuant and subject to the provisions of § 32-1-101 et seq., C.R.S.2006, the Special District Act (the Act). Skyland and East River are water and sanitation districts located in Gunnison County, and assess user fees and availability of service or facilities fees (ASF) for water and sewer services under article 4 of the Act. Districts may assess ASF on undeveloped property where water or sewer lines are installed and ready for connection to within 100 feet of the property line of the assessed property. User *113 fees are assessed on developed property. When a builder taps in and connects to a district's water system, the district's charges change from ASF to user fees.
User fees are based on the number of Equivalent Residential Units (EQR), defined as a single family house with one kitchen and three bathrooms. ASF are also based on the number of the developable EQR, but statutorily cannot be more than 50% of a district's user fees. See § 32-1-1006(1)(h)(I)(E), C.R.S.2006.
In 1989, both Skyland and East River issued general obligation bonds. In 1993, neither district could pay its bond debt. The districts restructured their debts through limited tax, general obligation bonds. Subsequently, Skyland paid down its bonds considerably, and East River paid off its bonds in 2001.
After paying off its bonds, East River entered into a Lease Purchase Agreement in 2001, to finance acquisition of an office building and construction of other improvements. East River was to repay the lessor with interest over a three-year period, but its yearly obligation to pay was expressly subject to the discretion of East River's board to make annual appropriations to cover the interest payments.
Multifamily Tract Four, the subject of this action, is a tract of land within the boundaries of Skyland and East River. It was originally platted for 65 units, of which 28 were developed by Blanton, a previous owner of the property. In 1996, Blanton obtained approval from the county to reduce the density of the remaining units from 37 to 31 units.
In May 2000, Gallagher purchased the undeveloped portion of Tract Four from Colorado Mortgage Company, which had acquired the property from Blanton in March 2000, following a foreclosure. The ASF fees were paid up when Gallagher acquired title.
Gallagher first received bills for ASF from the districts in June 2000, in the form of a postcard stating the amount due. The bills were significantly higher than Gallagher expected, and he called the districts' manager to discuss them. Discussions between the developers and the districts about whether the ASF bills were correct continued over several months. The districts' financial records reflect that the total number of units in Tract Four was calculated at 37 until August 2001.
In November 2000, Gallagher conveyed two parcels within Tract Four to Mountain West, a Colorado limited liability company, of which he and another developer were the members. Mountain West began construction of a triplex on that land (the three units), leaving one unit on the land undeveloped. In order to obtain a tap into the districts' services, the developers paid tap fees and all outstanding ASF in October 2000 and February 2001. After this, the developers paid no more ASF on any land in Tract Four.
In April 2001, construction on the three units was completed, the districts began charging user fees on that developed property, and the units previously subject to ASF were reduced by three.
In May 2001, the developers notified the county that they intended to develop only 25 units rather than 31. In August 2001, the county acknowledged the reduction to 25 units.
In September 2001, the districts wrote letters to Gallagher demanding payment of unpaid ASF and user fees and stating the districts' lien rights to enforce collection. During the last quarter of 2001, the districts adjusted the number of units subject to ASF fees to 22 units, taking into account that the three units had been developed. However, the districts and the developers continued to disagree over whether the districts' bills were accurate.
In January 2002, Mountain West sold Unit No. 1 of the three units to Gallagher to use for a model home. When the developers received a statement of ASF and user fees at closing, they believed the charges were excessive, and they placed $8,012 in escrow with the title company, with instructions to disburse the funds when the districts sent a corrected bill.
In July 2002, the title company offered to disburse funds to the districts, based on their bills, but the districts requested them not to *114 do so, because the developers and the districts were still in discussions over the correct amount of the bills.
In August 2002, the districts recorded a notice and statement of lien on the developers' real property in Tract Four in the real property records of the county. On September 10, 2002, the districts filed a complaint in district court seeking a decree that their liens were valid, that the liens be foreclosed, and that the property be sold at public sale to satisfy the liens.
On October 17, 2002, the developers filed an answer and counterclaims. In the counterclaims, the developers asked for an accounting, asserting, inter alia, that the districts had charged developers for more units than were approved by the county, had charged ASF fees in excess of statutory limits, and had charged attorney fees and costs that were not reasonable or necessary. The developers requested a declaratory judgment and injunction relating to the amount of ASF and late fees the districts could charge. The developers also claimed damages for unjust enrichment by the districts as a result of overpayments made both by them and by the previous owners. Finally, the developers asserted a claim for damages, alleging that the districts had filed a spurious lien against their property.
The case was tried to the court in August 2003. In December 2003, the trial court issued its Findings of Fact, Conclusions of Law, and Judgment. As pertinent here, the trial court found and concluded that the districts had improperly calculated their ASF; the districts were required to use amended budgets to calculate ASF; the Lease Purchase Agreement was indebtedness for which ASF could be assessed; property covered by the three units was subject to a lien for costs and attorney fees to collect user fees that had been paid in full by the time of trial; the voluntary payment rule barred the developers' counterclaims for credit or refund of excessive ASF; the statute of limitations barred the developers' counterclaim for credit or refund of excessive ASF; the Colorado Governmental Immunity Act barred the developers' spurious lien counterclaim; and the districts had substantially prevailed in the action and were entitled to an award of costs and attorney fees.
In so ruling, the trial court calculated Skyland's assessed ASF for 2001, and also found that Skyland could not assess ASF for 2002 or 2003. The trial court found that East River could not assess ASF for 2001, and calculated East River's ASF for 2002 and 2003. The trial court ordered the districts to file an accounting, specifying the amount of unpaid ASF for which they sought foreclosure, as well as an itemized statement of costs and attorney fees, allocated separately between their claims for ASF and user fees.
Immediately after the trial court entered its judgment, both districts prepared an amended budget for 2003, in which they adopted a resolution that specifically allocated their taxes for 2003 to pay for operations and maintenance expenses, contrary to their original 2003 budgets, which had allocated taxes to pay debt service.
In December 2003, the districts filed a motion to alter or amend the judgment, pursuant to C.R.C.P. 59, and tendered their amended budgets to the trial court as exhibits. In the motion, the districts asked the trial court to recognize that the districts had allocated their tax revenues through their budgets primarily to pay for operations and maintenance, and asked the court to change its ASF calculation and not require allocation of attorney fees. Also, because the trial court had directed that ASF be calculated based on an amended budget, the districts asked the trial court to use their 2003 amended budgets to calculate ASF for that year. The developers responded, challenging the districts' method of calculating ASF and their belated attempt to use the 2003 amended budgets.
In February 2004, the trial court ruled on the districts' C.R.C.P. 59 motion. The trial court again concluded that the districts had incorrectly assessed ASF, but did not determine that the districts could use their 2003 amended budgets to calculate ASF for that year. The trial court again ordered that the districts allocate their costs and attorney fees separately for ASF and user fees and file an itemized statement with the court.
*115 In November 2004, the trial court entered a final judgment and decree of foreclosure against all the undeveloped Tract Four property and the three developed units. The court determined that for 2001, Gallagher's property owed Skyland $589.10 in ASF and $288.66 in late fees, while Mountain West's property owed Skyland $22.00 in ASF and $10.78 in late fees. For East River, the court entered judgment that Gallagher's property owed $2,626.26 in ASF and $735.35 in late fees for the years 2002 and 2003, while Mountain West's property owed $98.08 in ASF and $27.46 in late fees for 2002 and 2003.
With respect to recoverable attorney fees and costs, the trial court allocated $124,941.15 in attorney fees and $5,219.91 in costs to Gallagher's property, $4,627.45 in attorney fees and $193.44 in costs to Mountain West's undeveloped fourth unit, and $4,955.11 in attorney fees and $193.44 in costs to each of the three units.
The trial court entered final judgments in rem in favor of the districts against the developers' property and ordered the statutory liens to be foreclosed and the property to be sold, with the proceeds to be applied to pay the judgments.
In January 2005, the trial court issued an order granting the developers' motion for approval of security and stay of execution pending appeal. The trial court accepted a property bond against the undeveloped property as a supersedeas bond.
This appeal of the judgment and bond order followed. Both parties challenge various aspects of the trial court's rulings. However, the judgments against the three units are not before us on appeal because those judgments have been satisfied and the appeal dismissed as to that property.

II. Standard of Review
In an appeal of a judgment entered after trial to the court, we defer to the trial court's credibility determinations and will disturb its findings of fact only if they are clearly erroneous and are not supported by the record. See C.R.C.P. 52; M.D.C./Wood, Inc. v. Mortimer, 866 P.2d 1380, 1383 (Colo.1994); Telluride Real Estate Co. v. Penthouse Affiliates, LLC, 996 P.2d 151, 155 (Colo.App.1999) (the credibility of witnesses and sufficiency, probative effect, and weight of the evidence, as well as any inferences or conclusions to be drawn therefrom, are all within the province of the trial court, and its findings on these matters will not be disturbed on review unless they are so clearly erroneous as to find no support in the record).
However, where the trial court's ruling involves issues of law, including statutory interpretation, our review is de novo. People v. Renander, 151 P.3d 657, 659 (Colo. App.2006); Ball Corp. v. Fisher, 51 P.3d 1053, 1056 (Colo.App.2001). We consider the interpretation of a governmental agency, such as a special district, in construing a statute, but its construction is advisory, not binding. Telluride Resort & Spa, L.P. v. Colo. Dep't of Revenue, 40 P.3d 1260, 1264 (Colo.2002); see Krupp v. Breckenridge Sanitation Dist., 1 P.3d 178, 183 (Colo.App.1999)(special district is an administrative agency), aff'd, 19 P.3d 687 (Colo.2001). Although interpretation of a statute by the agency charged with its enforcement is entitled to deference, we are not bound to defer to an agency decision that misconstrues or misapplies the law. Ball Corp. v. Fisher, supra, 51 P.3d at 1056.
We review a trial court's decision to grant or deny a C.R.C.P. 59 motion for an abuse of discretion. Kaercher v. Sater, 155 P.3d 437, 443 (Colo.App.2006); Buckley Powder Co. v. State, 70 P.3d 547, 564 (Colo.App. 2002).

III. Subject Matter Jurisdiction
The developers contend for the first time on appeal that, because the districts did not serve them with a notice of intent to file a lien statement, the liens were rendered invalid, and, thus, the trial court lacked subject matter jurisdiction over the districts' claims for enforcement of the liens. We disagree.
Whether a court has subject matter jurisdiction is an issue that may be raised at any time. Brown v. Silvern, 141 P.3d 871, 873 (Colo.App.2005). Subject matter jurisdiction is defined as a court's power to resolve *116 a dispute in which it renders judgment. Brown v. Silvern, supra, 141 P.3d at 873.
Under the Act, until paid, a special district's fees "constitute a perpetual lien on and against the property served, and any such lien may be foreclosed in the same manner as provided by the laws of this state for the foreclosure of mechanics' liens." Section 32-1-1001(1)(j)(I), C.R.S.2006.
The mechanics' lien statute provides that, at least ten days before filing a lien statement, a notice of intent to file a lien statement must be served upon the owner of the property. See § 38-22-109(3), C.R.S. 2006. To establish the existence of a right to a mechanics' lien, compliance with this statutory notice provision is necessary. FCC Constr., Inc. v. Casino Creek Holdings, Ltd., 916 P.2d 1196, 1199 (Colo.App.1996). If a mechanics' lien claimant fails to comply with the requirement of service of the notice of intent, he or she fails to meet the burden of proving a right to the lien under the statute. Moore Elec. Co. v. Ambassador Builder Corp., 653 P.2d 90, 93 (Colo.App.1982).
The developers contend that, because the districts recorded their notice and lien statements but did not serve them with a notice of intent to file a lien statement at least ten days prior to such recording, that omission rendered the liens invalid pursuant to the requirement for foreclosing on a mechanics' lien, and therefore the trial court lacked subject matter jurisdiction. The districts argue that, pursuant to § 32-1-1001(1)(j)(I), a district's fees "constitute a perpetual lien on and against the property served," and that service of a notice of intent is not required to perfect their statutory liens for ASF. We agree with the districts.
The purpose of the statutory notice of intent is to perfect a valid lien. Daniel v. M.J. Dev., Inc., 43 Colo.App. 92, 95, 603 P.2d 947, 949 (1979). However, where as here, the charges at issue are "in the nature of taxes," the lien is already perfected. North Wash. Water & Sanitation Dist. v. Majestic Sav. & Loan Ass'n, 42 Colo.App. 158, 160, 594 P.2d 599, 600 (1979) (in a case involving a special district's lien for water and sewer tap fees, the division concluded that following the mechanics' lien foreclosure procedure by filing a lien statement within the prescribed time limit was not required because the district's perpetual lien was already perfected)(citing Wasson v. Hogenson, 196 Colo. 183, 188-89, 583 P.2d 914, 917 (1978) (sewer services are in the nature of taxes, and special districts' perpetual liens have priority over prior deed of trust)). We find the reasoning of North Washington persuasive and applicable here, and we conclude that, because the districts' liens were perpetual and perfected, service of the notice of intent was unnecessary to preserve the lien. Rather, it was sufficient for the districts to file and record the statement of lien.
Accordingly, we reject the developers' contention that the court did not have subject matter jurisdiction over the districts' claims.

IV. Assessment and Calculation of ASF
Although this case presents numerous issues on appeal and cross-appeal, the central issue is whether any ASF is owed by the developers to the districts for the years 2001-2003 and the proper calculation of any ASF that may be owed. In order to resolve that central issue, we are called upon to interpret §§ 32-1-1006(1)(h)(I)(C) & (E) and 32-11-603, C.R.S.2006.
Section 32-1-1006(1)(h)(I)(C) provides:
Availability of service or facilities charges shall be assessed solely for the purpose of paying principal of and interest on any outstanding indebtedness or bonds of such district and shall not be used to pay any operation or maintenance expenses of, nor capital improvements within or for, such district.
Section 32-1-1006(1)(h)(I)(E) provides in pertinent part:
Availability of service or facilities charges shall be a percentage, not to exceed fifty percent, of the fees, rates, tolls, or charges for use of services or facilities of such district. . . . In addition the aggregate amount of revenue budgeted and expected to be derived from availability of service or facilities charges shall not exceed the total amount of principal of and interest on the outstanding indebtedness or bonds of such *117 district for such service currently budgeted for and to mature or accrue during the annual period within with such availability of service or facilities charges are payable, less the amount budgeted and expected to be produced during such period by the mill levy allocable to such service then being budgeted for and levied and assessed by such district.
Section 32-1-1603, provides, in pertinent part:
[S]pecial districts which levy taxes for payment of general obligation debt shall certify separate mill levies to the board of county commissioners, one each for funding requirements of each such debt in accordance with the relevant contracts or bond resolutions . . . and one for the remainder of the budget of said district.
The trial court ruled that § 32-1-1603 "requires a special district that levies taxes for the payment of general obligation debt to certify a special mill levy for payment of that debt and a separate levy for the remainder of the budget of that district." The trial court further ruled that § 32-1-1006(1)(h)(I)(E) "limits ASF fees to budgeted debt service (principal and interest) less the amount budgeted and expected to be produced by the mill levy allocable to such debt service." The court also concluded that the districts were required to use amended budgets to calculate ASF.
The districts and the developers appeal different aspects of the trial court's legal and statutory analysis as to the proper calculation of ASF. In their appeal, the developers contend that East River is not entitled to any ASF for 2002-2003 because the interest payments under the Lease Agreement do not constitute indebtedness under § 32-1-1006(1)(h)(I)(C) and (E). While agreeing that the trial court correctly ruled that ASF must be calculated by determining the budgeted debt service and subtracting the amount expected to be produced by the certified mill levy allocable to that debt service, the developers also contend that the trial court incorrectly ruled that the districts were required to use amended budgets in calculating their yearly ASF.
In their cross-appeal, the districts contend that the trial court erred in interpreting the Act with respect to how mill levy certification and budgeted debt are used to determine ASF. The districts also contend that, while the trial court correctly determined that the districts should calculate ASF using amended budgets, the trial court erred by not using the districts' 2003 amended budgets to calculate ASF due for 2003.
In reviewing the interpretation of a statute, a reviewing court should look first to the language of the statute, and the words and phrases therein should be given effect according to their plain and ordinary meaning. Stevinson Imports, Inc. v. City & County of Denver, 143 P.3d 1099, 1103 (Colo. App.2006); Ball Corp. v. Fisher, supra, 51 P.3d at 1056. When a court construes a statute, it should read and consider the statute as a whole and interpret it in a manner giving consistent, harmonious, and sensible effect to all its parts. Welby Gardens v. Adams County Bd. of Equalization, 71 P.3d 992, 995 (Colo.2003); People v. Andrews, 871 P.2d 1199, 1201 (Colo.1994). In doing so, a court should not interpret a statute in ways that defeat the legislature's obvious intent or render part of the statute either meaningless or absurd. Reg'l Transp. Dist. v. Lopez, 916 P.2d 1187, 1192 (Colo.1996); Stevinson Imports, Inc. v. City & County of Denver, supra, 143 P.3d at 1103. "When interpreting tax statutes, a court should not view the power to impose taxes expansively, and should resolve doubts in favor of the taxpayer." Stevinson Imports, Inc. v. City & County of Denver, supra, 143 P.3d at 1103 (quoting Ball Corp. v. Fisher, supra, 51 P.3d at 1056).
Statutes should not be read in isolation but together with all other statutes relating to the same subject or having the same general purpose, to the end that a statute's intent may be ascertained and absurd consequences avoided. Huddleston v. Bd. of Equalization, 31 P.3d 155, 159 (Colo. 2001). "This is especially true where a statute intimates by its plain language an intent to incorporate other statutory provisions." Huddleston v. Bd. of Equalization, supra, 31 P.3d at 159. Further, a comprehensive regulatory *118 scheme must be construed as a whole to give effect and meaning to all its parts. Wolford v. Pinnacol Assurance, 107 P.3d 947, 951 (Colo.2005).

A. East River ASF for 2002-2003
We first address the developers' contention that the trial court erred by ruling that East River's Lease Purchase Agreement was indebtedness that could be used to assess and calculate ASF. The developers contend that no ASF is owed to East River for 2002 and 2003, because the Lease Purchase Agreement cannot properly be used to calculate ASF, since it is not indebtedness within the meaning of § 32-1-1006(1)(h)(I)(C) and (E). We agree.
After retiring its bond indebtedness in 2001, East River entered into the Lease Purchase Agreement to purchase an office building, which it counted as indebtedness for assessing and calculating ASF in 2002 and 2003. Article VI, § 6.1(f) of the Lease Purchase Agreement provided that the district's board "shall determine in its absolute discretion" whether to appropriate funds for the rent on an annual basis.
The developers argue that the Lease Purchase Agreement is not outstanding indebtedness under § 32-1-1006(1)(h)(I)(C), which authorizes ASF to be assessed solely for paying "principal of and interest on any outstanding indebtedness or bonds of such district," because it does not require East River to appropriate funds for payment of future interest and principal, but instead relies on East River's board to make annual appropriations at its discretion. See Gude v. City of Lakewood, 636 P.2d 691 (Colo.1981)(rent-to-own financing plan of new municipal office building did not create general obligation debt requiring voter approval under Colo. Const. art. XI, § 6 because funds were to be allocated annually at the city's discretion, and the future governing body was not obligated to appropriate funds to discharge the debt); Colo. Criminal Justice Reform Coalition v. Ortiz, 121 P.3d 288 (Colo.App.2005)(lease purchase agreements for correctional facility and academic facility in which the parties were not bound to renew the lease annually do not create debt or financial obligation in the constitutional sense).
The districts concede that the Lease Purchase Agreement is not debt in the constitutional sense, but contend that it is a form of debt subject to ASF assessment under § 32-1-1006(1)(h)(I)(C).
We need not decide whether indebtedness in the constitutional sense is equivalent to indebtedness as contemplated by § 32-1-1006(1)(h)(I)(C) for the purposes of assessing ASF. The Lease Purchase Agreement itself provides in article VI, § 6.1(e):
It is the intention of the parties to this Lease that this Lease is subject to annual appropriation by the Board. This Lease (and the Base Rentals due hereunder) do not constitute a debt or indebtedness or multiple-fiscal year debt or other financial obligation of the District within the meaning of any constitutional or statutory provision or limitation, and shall not be considered or held to be general obligations of the District.

(Emphasis added.)
Thus, the plain language of the Lease Purchase Agreement states that the Lease and payments made thereunder are not multiple-fiscal year indebtedness or any other kind of debt, and does not constitute debt or a financial obligation within the meaning of any constitutional or statutory provision. We view this provision as dispositive and conclude, therefore, that the Lease is not indebtedness within the meaning of § 32-1-1006(1)(h)(I)(C) and (E). Accordingly, the Lease Purchase Agreement may not be used to assess and calculate ASF.
Because of our resolution of this issue, we need not address the developers' further contention that the Lease Purchase Agreement cannot be used to assess ASF because it enabled East River to make capital improvements and pay operation expenses. See § 32-1-1006(1)(h)(I)(C) (ASF cannot be imposed for payment of operation expenses or capital improvements).
In sum, we conclude East River had no legal basis for its foreclosure claim against Tract Four for unpaid ASF and late fees for 2002-2003. Accordingly, we reverse the trial *119 court's judgment to the extent the court held that East River could assess ASF for the years 2002-2003, and we remand the case to the trial court to enter judgment as a matter of law in favor of the developers on this issue.

B. Calculation of ASF
In their cross-appeal, the districts contend that the trial court erred in its interpretation of how yearly ASF is to be calculated under § 32-1-1006(1)(h)(I)(E). Specifically, the districts contend the court erred by holding that "§ 32-1-1006(1)(h)(I)(E) limits ASF fees to budgeted debt service (principal and interest) less the amount budgeted and expected to be produced by the mill levy allocable to such debt service." (Emphasis added.) Rather, the districts contend the proper statutory interpretation is that total ASF cannot be more than the principal and interest due on a district's indebtedness or bonds less the amount that the district actually allocates in its budgets, as amended, for debt payment out of the tax revenues collected through its mill levy. We disagree.
Here, the districts' general obligation bonds required each district to pledge all its revenue, taxes, tap fees, user fees, and ASF as security for the payment of the bonds. The indenture of trust for each bond defined "gross pledged revenues" as the aggregate of taxes, including the mill levy, tap fees, user fees, and capital improvement fees. Operation and maintenance expenses were paid from gross pledged revenues. The bond documents forbade use of ASF for operation and maintenance and required ASF to be deposited in a Debt Service Account. See § 32-1-1006(1)(h)(I)(C) (ASF may not be imposed for payment of operation or maintenance expenses).
In each year from 2001 to 2003, Skyland certified one mill levy to the board of county commissioners and specified that its proceeds would be used to repay bonds. In 2001, East River also certified one mill levy for debt service on bonds; in 2002 and 2003, it certified a mill levy for operating expenses only.
According to the districts, funds generated by the mill levy were initially placed in the Debt Service Account, and large sums were later transferred into the General Fund to pay operation expenses. The relatively small remainder of funds generated by the mill levy not spent on operation and maintenance expenses or transferred into the General Fund, plus ASF and certain other funds, were defined as "net pledged revenues" and were used to pay principal and interest on the bond. The districts argue that if they calculate the figures retrospectively, subtracting that small remainder from the amount budgeted to pay debt results in a much higher ASF limit than was actually charged by the districts.
The districts thus contend, with respect to the mill levies that were certified for debt service, that once they had spent a large portion of the mill levy on operation and maintenance expenses, the remainder, which they allocated for debt payment in their amended budgets, should be used to calculate ASF. The districts argue that the trial court erred by using the mill levy certification, rather than the districts' actual revenue allocation through its ongoing budgeting process, as the amount to be subtracted in the yearly ASF calculation. We are not persuaded.
In its order denying the districts' C.R.C.P. 59 motion, the trial court rejected the districts' statutory interpretation and reasoned as follows:
Section 32-1-1006(1)(h)(I)(E), C.R.S.2002 limits the total amount of ASF fees to the total amount of annual debt service payable less "the amount budgeted and expected to be produced during such period by the mill levy allocable to such service then being budgeted for and levied and assessed by such district." In adopting this formula, the General Assembly intended to limit ASF fees to the difference between annual debt service and taxes levied to service that debt. Thus, a mill levy that is both budgeted for and levied and assessed for debt service must be deducted from the total amount of annual debt service to determine the total allowable ASF fees. Had the General Assembly intended to rely solely on amounts budgeted for debt service, it would not have included language regarding the mill levy levied and *120 assessed by a special district for debt service.
[The districts] both budgeted and levied and assessed their entire mill levy for debt service. [The districts] certainly have the option to determine whether their mill levy is allocable to operating expenses or debt service. However, once the mill levy is allocated to debt service, the statute requires that the amount certified, and hence budgeted and expected to be produced, be used to calculate the ASF limitation.
[The districts'] interpretation of the statute renders it meaningless. Their reading would allow them to designate their entire mill levy to debt service, assess the maximum amount of ASF fees, and then adjust for the ASF limitation by transferring funds out of the debt service fund to the general fund. This approach is flawed for two reasons. First, the debt service fund receives revenues for sources in addition to taxes and ASF fees, all of which are comingled. Thus, there is no way to determine the source of the funds transferred. Second, operation and maintenance expenses and capital improvements are paid from the general fund, purposes for which ASF fees may not be used. See § 32-1-1006(1)(h)(I)(C), 2002. Thus, [the districts] would be able to do indirectly what they could not do directly.
We perceive no error in the trial court's reasoning and analysis.
We agree with the trial court that §§ 32-1-1006 and 32-1-1603 should be read together, because both are part of the Act, which sets forth a comprehensive regulatory scheme for special districts. See Wolford v. Pinnacol Assurance, supra, 107 P.3d at 951. In our view, the language of § 32-1-1006(1)(h)(I)(E), by using the words "mill levy allocable to such service," refers to the process described in § 32-1-1603, which requires that mill levies be certified to the board of county commissioners separately for the funding requirements of general obligation debt and for other budgetary requirements of the district. See Huddleston v. Bd. of Equalization, supra, 31 P.3d at 159.
We conclude that the plain language of § 32-1-1006(1)(h)(I)(E) refers to a prospective financial calculation, or a "snapshot" of a district's financial situation prior to the ensuing fiscal year. Because revenue from ASF is described as "budgeted and expected to be derived," this logically refers to a prospective budget. Further, that statutory provision refers to "principal of and interest on the outstanding indebtedness or bonds" as being for "such service currently budgeted for," and "to mature or accrue during the annual period within which" ASF is payable. The statute also refers to the mill levy "then being budgeted for and levied and assessed by such district" (emphasis added). The actions of budgeting, levying, and assessing by the district are set at a particular moment in time by use of the word "then."
Thus, the indebtedness to be budgeted is the indebtedness due to accrue during the next year. Although the budget itself may later change, the calculation of ASF is to be based on the indebtedness then "currently budgeted."
The districts calculate yearly ASF under § 32-1-1006(1)(h)(I)(E) by subtracting "the amount budgeted and expected to be produced during such period by the mill levy" from the indebtedness. Because the amount has been budgeted at the time it is "expected to be produced," we conclude this is a prospective budget.
We also construe the repeated time references in the statute to mean that, once the mill levy has been certified and allocated to debt service, and a budget is in place for the indebtedness or bonds that will mature during the next year, the ASF budgeted at that time and expected to be derived shall not exceed the amount of that indebtedness or bonds, less the amount of the mill levy that has been allocated to debt service as certified pursuant to § 32-1-1603.
We also conclude, as did the trial court, that the districts' interpretation of the statute renders it meaningless. Under the districts' interpretation, not only could the mill levy be transferred out of the debt service fund and used for purposes other than as certified to the county, but the budget could be amended to reduce the amount of the mill levy allocable to debt after the district has *121 charged a higher ASF, to justify that higher ASF.
Moreover, accepting the districts' interpretation would require us improperly to view the power to impose taxes expansively, see Stevinson Imports, Inc. v. City & County of Denver, 143 P.3d 1099 (Colo.App.2006), whereas, accepting the trial court's interpretation accords with other significant limiting provisions on the assessment of ASF under § 32-1-1006(1)(h). For example, ASF charges may be made only after being considered at a meeting where notice has been provided by mail to each taxpaying elector, see § 32-1-1006(1)(h)(I)(B), and may not be used to pay operation or maintenance expenses or capital improvements. See § 32-1-1006(1)(h)(I)(C). ASF shall be assessed only when water or sewer lines are installed and ready for connection within one hundred feet of any property line of the lot to be assessed, see § 32-1-1006(1)(h)(I)(D), and may not exceed fifty percent of user fees, as calculated by EQR. See § 32-1-1006(1)(h)(I)(E).
Section 32-1-1006(1)(h)(I)(E) also requires two separate actions in calculating ASF. First, the district must prospectively determine a budget which it then uses to calculate ASF. Second, the mill levy expected and certified to be used for the funding requirements of debt must be used as the amount to be subtracted in the annual calculation of a district's total ASF. Thus, all these provisions indicate a legislative intent to limit ASF to a precise annual statutory calculation, not to expand ASF beyond that encompassed by the plain language of the Act, and to provide only for such portions of a district's principal and interest payments on outstanding indebtedness or bonds that are not otherwise covered in the certified mill levy.
We reject the districts' argument that this interpretation renders meaningless the language in § 32-1-1603 that certification be made "in accordance with" the provisions of the districts' contracts or bonds. The districts are required by their bond documents to certify a specific minimum mill levy, but they have not pointed to any language in the bond documents indicating that certifying a percentage of required mill levies for either debt service or general operating expenses or both would violate the terms of their bond contracts. The districts are free to certify their mill levies and calculate their budgets in accordance with pertinent statutory provisions. However, they are not free to assess more ASF than the difference between the budgeted debt service and the mill levy certified and allocable to indebtedness.
Therefore, we conclude the trial court correctly determined that ASF is limited to budgeted debt service less the amount budgeted and expected to be produced by the mill levy allocable to such debt service as certified to the county by the districts.

C. Use of Amended Budgets
The developers contend the trial court erred in ruling that the districts were required to use amended budgets to calculate ASF. The districts by contrast urge us to uphold this aspect of the trial court's judgment. Relying on § 29-1-109, C.R.S.2006, which allows districts to amend their budgets and make supplemental appropriations after adopting a budget, and conceding that certification of a mill levy is effective upon adoption of the budget, pursuant to § 29-1-108(5), C.R.S.2006, the districts argue that they can still reallocate those revenues at a later time. They maintain that to conclude otherwise would render meaningless the power to amend budgets under § 29-1-109. We agree with the developers.
The General Assembly established a procedure for the amendment of budgets under certain circumstances, such as revenues higher or lower than anticipated, see § 29-1-109. We conclude the possibility that the budget may be amended during any given fiscal year is immaterial to the assessment and calculation of a district's total ASF for the year at issue. Nothing in the language of § 32-1-1006(1)(h)(I)(E), which refers to debt service that is "currently budgeted," suggests that the ASF calculation may be revised when the budget changes or when other financial changes take place in the district.
Because we have concluded the statutory formula contemplates that the calculation of ASF will be done prospectively, on a budget *122 adopted prior to the new fiscal year, we further conclude the total yearly ASF may not be recalculated based on an amended budget that is adopted later. While the district may amend its budget and reallocate its resources in its discretion, including seeking other sources of revenue, it may not reassess total ASF during the year. Thus, we agree with the developers and conclude that the trial court erred in ruling that the districts were required to use amended budgets to calculate ASF. Accordingly, we necessarily reject the districts' contention on cross-appeal that the trial court erred in not considering their 2003 amended budgets to calculate ASF for 2003.

D. Conclusion
We reverse the judgment of the trial court in favor of East River for fiscal years 2002 and 2003. We also reverse the judgment in favor of Skyland for 2001, because it was based on ASF calculations using amended budgets. We remand for the trial court to determine, based on original budgets, how much ASF, if any, Skyland was entitled to charge the developers for 2001.

V. ASF and the Proper Unit Calculation
Because it will arise on remand, we also address the developers' contention that the trial court erred in accepting a posttrial accounting of ASF from the districts based on 28 units (31 less the developed 3 units) in Tract Four. We agree with the developers.
Both districts' regulations concerning billing procedures for ASF provide, in pertinent part:
In the event that any parcel of property, lot or tract, which is subject to assessment of Availability of Service Charges as set forth in this Section . . ., is subdivided, re-subdivided, replatted, partitioned, rezoned, or changed in any other manner, Availability of Service Charges shall continue to be assessed, in accordance with this Section . . ., against each resulting parcel of property, lot or tract from the effective date of such subdivision, re-subdivision, replatting, partition, zoning, or other change.
(Emphasis added.)
Until August 2001, the districts assessed ASF on 37 units, which did not reflect the 1996 approval by the county to reduce density to 31 units.
However, in May 2001, Mountain West wrote a letter to the county planning department, stating that the developers would only be developing 25 units on the remainder of Tract Four, and that "[t]his new total of 25 units represents a reduction of 6 units from the remaining approved units for Multifamily Tract 4."
On August 1, 2001, the county planning department responded in a letter stating as follows:
The Planning Commission Decision would allow a total of 31 more units to be constructed. [The developers'] letter of May 16, 2001 indicating that they will be building six fewer than allowed by that Decision is correct.
We understand, then, that the applicant is waiving its opportunity to construct all of the additional 31 units, and will be submitting plats for a total of only 25 more units in the future.
Following that letter, the districts assessed ASF on the basis of 22 units, effective August 1, 2001 (25 units less the 3 units which had already been developed).
In its Findings of Fact and Conclusions of Law, the trial court ordered the districts to recalculate ASF "in accordance with the court's rulings herein, specifying the amount, if any, of unpaid ASF fees for which they seek a lien. Said accounting shall include an adjustment for density reductions."
The districts submitted their accounting as part of their C.R.C.P. 59 motion, and calculated ASF for 2001-2003 based on 31 units, arguing that 31 units reflected the proper total for assessment of ASF because the county had taken no formal zoning action to reduce the number of potential units from 31 to 25. However, in their reply brief in support of their C.R.C.P. 59 motion and on appeal, the districts take development of the *123 3 units into account, and argue that the total number of remaining undeveloped units is 28.
In the Judgment and Decree of Foreclosure, the trial court accepted the districts' accounting of ASF based on 28 units.
The districts contend that the parties stipulated before trial to a density of 31 units (28 units after the 3 units were developed); the county took no formal zoning action that reduced the density from 31 to 25 units; and formal action by the county was required to change the number of units. Therefore, the districts argue, the trial court correctly relied on the parties' stipulations and the county's lack of formal action in approving the ASF calculation based on 28 units.
Contrary to the districts' argument, the districts' own regulations permit a change "in any other manner," in addition to formal zoning or platting decisions, and the county's letter of August 1, 2001 acknowledges that the density is set at 25 units as of that date and effectively precludes the developers from arguing otherwise. Indeed, the record shows that the districts acknowledged that change in density, because their billing of ASF after August 1, 2001 was based on 22 units (25 units less the 3 developed units).
Further, the stipulations to density in the record only involved the 1996 reduction from 37 to 31 units and the construction of the 3 units, but did not include the further reduction to 25 units in 2001, because the parties disputed whether the developers' exchange of letters with the county reduced the total number of units to 25. Thus, the parties' stipulations did not preclude the developers from demonstrating that the density was further reduced in August 2001.
Accordingly, on remand, to the extent any ASF is owed after August 1, 2001, it should be calculated based on a density of 22 units.

VI. Developers' Counterclaims for Credit or Refund
The developers contend that the trial court erroneously dismissed their counterclaims for declaratory judgment and unjust enrichment, which sought credit for or refund of ASF overcharges and late fees assessed against Tract Four during the entire time the developers and the previous owners owned the property, as barred by the statute of limitations and the voluntary payment rule. We agree in part as to the statute of limitations, but disagree as to the voluntary payment rule.

A. Statutes of Limitations
The developers contend that their counterclaims for declaratory judgment and unjust enrichment are compulsory counterclaims that were timely filed under § 13-80-109, C.R.S.2006, and that the trial court erred in ruling otherwise. In the alternative, the developers contend that, even if their claims are not considered compulsory counterclaims, they were not barred by the applicable statute of limitations.

1. Compulsory Counterclaims
The developers contend the trial court erred by determining that their counterclaims for refund or credit were not subject to § 13-80-109, the statute of limitations governing compulsory counterclaims, but were governed instead by § 13-80-102(1)(h), C.R.S.2006. We agree in part.
Section 13-80-102, C.R.S.2006, provides in pertinent part:
(1) The following civil actions, regardless of the theory upon which suit is brought, or against whom suit is brought, shall be commenced within two years after the cause of action accrues, and not thereafter:
. . .
(h) All actions against any public or governmental entity or any employee of a public or governmental entity. . . .
The parties agree that § 13-80-102(1)(h) is the general statute of limitations applicable to claims against the districts.
However, § 13-80-109 provides a different limitations period for compulsory counterclaims:
Except for causes of action arising out of the transaction or occurrence which is the subject matter of the opposing party's claim, the limitation provisions of this article shall apply to the case of any debt, contract, obligation, injury, or liability alleged *124 by a defending party as a counterclaim or setoff. A counterclaim or setoff arising out of the transaction or occurrence which is the subject matter of the opposing party's claim shall be commenced within one year after service of the complaint by the opposing party and not thereafter.
The trial court found that defendants' counterclaims for refund or credit of previously paid ASF "did not arise out of [the districts'] claims related to unpaid fees," and that § 13-80-109 was, therefore, inapplicable.
The districts argue that their claims in rem to foreclose on statutory liens arose out of the developers' failure to pay assessed ASF for 2001-2003 and that the developers' counterclaims asserting personal claims for credit or refunds of ASF paid from January 1997 through February 2001 do not arise out of the same transaction or occurrence.
Pursuant to § 13-80-102(1)(h), actions against any governmental entity must normally be commenced within two years after the cause of action accrues. The purpose of § 13-80-109 is to limit noncompulsory counterclaims to whatever limitations period would normally be applicable, but to provide a different limitation period for compulsory counterclaims. Duell v. United Bank, 892 P.2d 336, 340-41 (Colo.App.1994)(statute allows a party against whom a claim has been asserted to plead a stale counterclaim in response to the claim asserted against that party, if it arises out of the same transaction or occurrence, or the same series thereof).
The developers filed their counterclaims on October 17, 2002. Thus, any noncompulsory counterclaims and setoffs that accrued before October 17, 2000 would be barred by § 13-80-102(1)(h).
A compulsory counterclaim is defined in C.R.C.P. 13(a) as a counterclaim that "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." In Colorado, the logical relationship test determines whether this requirement is met. "Any claim that a party might have against an opposing party, which is logically related to the claim brought by the opposing party . . . is a compulsory counterclaim." Visual Factor, Inc. v. Sinclair, 166 Colo. 22, 26, 441 P.2d 643, 645 (1968). "In applying this test, a trial court must determine whether the claims involve all or many of the same factual and legal issues, or offshoots of the same basic controversy between the parties." See McCabe v. United Bank, 657 P.2d 976, 978 (Colo.App.1982); see also Ratcliff v. Citizens Bank, 768 N.E.2d 964, 967 (Ind.Ct.App.2002)(transaction or occurrence broadly defined by logical relationship test to effectuate the rule's intended purpose of avoiding multiple lawsuits between the same parties arising from the same event or events). "A logical relationship exists when the counterclaim arises from the same `aggregate of operative facts' as the opposing party's claim." McCabe v. United Bank, supra, 657 P.2d at 978 (quoting Revere Copper & Brass Inc. v. Aetna Cas. & Sur. Co., 426 F.2d 709, 714 (5th Cir.1970)). The test constitutes a broad, flexible, and practical standard, which prevents the filing of a multiplicity of actions and encourages the resolution of all disputes arising out of a common factual matrix in a single lawsuit. McCabe v. United Bank, supra, 657 P.2d at 978; cf. Fed. Deposit Ins. Corp. v. Hulsey, 22 F.3d 1472, 1486-87 (10th Cir.1994)(recoupment is a compulsory counterclaim that is a defense arising out of some feature of the transaction upon which plaintiff's complaint is grounded; it arises from the same transaction or occurrence, seeks relief of the same kind or nature, and seeks an amount not in excess of plaintiff's claim). Thus, a counterclaim is logically related to the opposing party's claim where separate trials on each of their respective claims would involve a substantial duplication of effort and time by the parties and the courts. Beathune v. Cain, 30 Colo.App. 321, 324, 494 P.2d 603, 604-05 (1971); see In re Estate of Krotiuk, 12 P.3d 302, 304 (Colo.App.2000).
We first consider whether the developers' counterclaims for the period of time they personally owned the property were compulsory. If so, they are governed by § 13-80-109.
The districts brought in rem claims to foreclose liens as a result of the developers' failure to pay ASF after February 28, 2001. *125 The developers counterclaimed for an accounting, declaratory judgment, and damages for unjust enrichment, based on alleged overpayments of ASF and other fees made by them and the previous owners. On appeal, the developers characterize their counterclaims as claims for refund or credit, based on these alleged overcharges.
The districts' claims involved enforcement of a lien and foreclosure and sale of property for the amount the developers still owed from February 2001, the last time ASF was paid, until the districts filed their complaint in September 2002. That amount would be determined by how much yearly ASF the districts could properly charge, which in turn depended on issues of statutory interpretation, calculation of unit density, and the correct calculation of late fees. Similarly, the developers' counterclaims concerned whether the districts had overcharged them for ASF and other fees they paid to commence construction of the three units, and also whether the districts billed the developers at an excessive rate from February 2001 until the complaint was filed. This determination depended upon the same issues of statutory interpretation, calculation of unit density, and the correct calculation of late fees.
We conclude the developers' direct counterclaims arose from the same transaction or occurrence or series of transactions that are the subject matter of the districts' claims. See Duell v. United Bank, supra, 892 P.2d at 340-41. The counterclaims for refund or credit are logically related and arise from the same aggregate of operative facts. The dispute involves many of the same factual and legal issues, including the same basic controversy between the same parties over the proper calculation of ASF on the same land. See McCabe v. United Bank, supra, 657 P.2d at 978. Much of the same evidence would support or refute both the districts' principal claim and the developers' counterclaims, and can be considered as a common factual matrix. See Sage Realty Corp. v. Ins. Co. of N. Am., 34 F.3d 124 (2d Cir.1994)(counterclaims concerning the proper calculation of additional rent and expenses inextricably interwoven with claims for unpaid additional rent and arise out of the same transaction or occurrence). A separate trial would be a considerable duplication of effort and time by the parties, as the parties were identical, and the same evidence would likely be presented in both trials. See Beathune v. Cain, supra, 30 Colo.App. at 324, 494 P.2d at 604-05. The developers' counterclaims for overcharges during the time period when they owned the property were a claim back against the district for refund of an amount paid or a credit against an amount that the districts were claiming in their complaint. See Reiter v. Cooper, 507 U.S. 258, 264, 113 S.Ct. 1213, 1218, 122 L.Ed.2d 604 (1993)(shipper's assertion that motor common carrier's rate was unreasonable, asserted as a counterclaim in carrier's action to recover freight undercharges, was a compulsory counterclaim for recoupment).
Accordingly, because we conclude that the developers' counterclaims for the period they owned the property arose out of the same transaction or occurrence as the subject matter of the districts' claims, that aspect of their counterclaims was compulsory and governed by the limitation period in § 13-80-109. Hence, they were timely filed within one year after the filing of the districts' complaint.
However, we reach a different conclusion regarding the developers' counterclaims that are based on an assignment of rights from the previous owners.
The developers contend that any claims or causes of action for overcharges of ASF that were assigned to them by the previous owners also arose out of the same transaction or occurrence as the districts' lien claims against the developers, and were therefore compulsory. We disagree.
Contemporaneously with the filing of the developers' counterclaims on October 17, 2002, the previous owners of Tract Four assigned to Gallagher all claims, demands, and causes of action they had against the districts, including claims for fees or charges incurred regarding the real property. To the extent that any of these claims accrued before October 17, 2000, they are barred under § 13-80-102(1)(h), but would not be barred under § 13-80-109.
*126 Although the statutory interpretation issue of how to calculate yearly ASF would be the same for every property owner who was being charged ASF by the districts, we do not agree with the developers that these assigned claims arose from the same transaction or occurrence that is the subject of the districts' complaint. We perceive no logical relationship between ASF that the previous owners paid in full and claims for ASF that the districts had against the developers for unpaid ASF and enforcement of liens. The previous owners' transactions with the districts involved different parties from the dispute between districts and developers, and because the previous owners paid ASF, there was no need for the districts to enforce their liens against those parties. No claims existed by the districts against the previous owners, and evidence to prove the previous owners' claims against the district would be different from evidence to prove the developers' claims against the districts. The only connection between the previous owners' claims and the developers' claims is that the claims were assigned to the developers. However, the claims were still in the nature of personal claims established by the rights of the previous owners. See City of Arvada v. City & County of Denver, 663 P.2d 611, 616 (Colo.1983)(payment of fee for water service was a personal payment, and although related to the land, it did not run with the land).
Accordingly, we conclude that claims originally belonging to the previous owners were not compulsory counterclaims, and that the trial court correctly concluded these claims were governed by § 13-80-102(1)(h), rather than§ 13-80-109.
We now consider when the developers' and the previous owners' claims accrued to determine whether the claims were barred by the two-year statute of limitations in § 13-80-102(1)(h).

2. Accrual of Claims Under § 13-80-102(1)(h)
The developers contend that, even assuming their counterclaims are not compulsory, the trial court erred in determining that their cause of action accrued when the districts imposed ASF charges. We disagree.
Section 13-80-108(8), C.R.S.2006, sets forth Colorado's discovery rule for accrual of claims:
A cause of action for losses or damages not otherwise enumerated in this article shall be deemed to accrue when the injury, loss, damage, or conduct giving rise to the cause of action is discovered or should have been discovered by the exercise of reasonable diligence.
The trial court found:
Gallagher and his predecessors in interest were aware that plaintiffs were charging ASF fees when the bills were received. The statutory limitations on the assessment of ASF fees are readily ascertainable, and Gallagher and his predecessors in interest need only have obtained the budgets to determine if plaintiffs were properly charging ASF fees. Section 32-1-1006(1)(h)(I)(B) . . . requires a special district to provide notice of any meeting at which ASF fees will be considered. Thus, Gallagher and his predecessors in interest should have discovered that the ASF fees were contrary to statute through the exercise of reasonable diligence when the fees were imposed.
The developers contend that their counterclaims, including their own direct claims and the previous owners' assigned claims, did not accrue until shortly before trial, when the districts produced their budgets and mill levy certifications, and that is when they discovered the districts' statutory violations relating to the calculation of ASF. They argue that they and the previous owners had no reason to question the districts' authority to charge ASF, and that a determination of whether the billed ASF was lawful required sophisticated knowledge and a detailed analysis of the amounts charged. The districts contend that, because all the required information was a matter of public record, and because the developers were sophisticated and experienced with special districts and ASF, they should have discovered the information needed to support their claims through the exercise of reasonable diligence. We agree with the districts.
*127 The critical inquiry concerning when a cause of action accrues is knowledge of the facts essential to the cause of action, not knowledge of the legal theory upon which the action may be brought. Mastro v. Brodie, 682 P.2d 1162, 1168 (Colo.1984). A claim for relief does not accrue until the claimant "knows, or should know, in the exercise of reasonable diligence, all material facts essential to show the elements of that cause of action." Miller v. Armstrong World Indus., Inc., 817 P.2d 111, 113 (Colo.1991) (quoting City of Aurora v. Bechtel Corp., 599 F.2d 382, 389 (10th Cir.1979)).
Here, the record shows that Blanton, the previous owner of the land, was a developer, who built 28 of the units on Tract Four before the undeveloped land was foreclosed and deeded to Colorado Mortgage Company. The record further shows that Gallagher also was a builder and real estate developer, who had experience in calculating charges from special districts, and he had formed and served on metro districts and headed a water and sewer committee as town councilman.
The trial court found, with record support, that both the developers and the previous owners were aware that the districts had charged a certain sum in ASF when they received their bills. The record also shows that other material information on how ASF was calculated was publicly available and obtainable in the exercise of reasonable diligence. The trial court further found, with record support, that the statutory limitations on the assessment of ASF were readily ascertainable, and the districts' budgets were a matter of public record. Further, special districts are required to provide notice of any meeting at which ASF will be considered. See § 32-1-1006(1)(h)(I)(B). Thus, the record supports the trial court's finding that the developers and the previous owners should have known, or should have discovered by the exercise of reasonable diligence, that the assessed ASF was contrary to statute when the fees were imposed.
To the extent the developers' direct counterclaims for credit or refund of ASF are not compulsory, the applicable statute of limitations is § 13-80-102(1)(h), and any such claims from the time the developers purchased the property in May 2000 until October 17, 2000 accrued outside the two-year limitations period.
Moreover, all the previous owners' claims accrued, at the latest, in May 2000, when the developers bought the land. This is more than two years before the counterclaims were filed, and because their claims were not compulsory counterclaims, we conclude the previous owners' claims that were assigned to the developers were barred by § 13-80-102(1)(h).

B. Voluntary Payment Rule
The developers contend the trial court erred in determining that their counterclaims were barred by the voluntary payment rule. We are not persuaded.
The voluntary payment rule has been adopted in Colorado. See Prilliman v. City of Canon City, 146 Colo. 159, 360 P.2d 812 (1961); Davis v. City & County of Denver, 120 Colo. 186, 207 P.2d 1185 (1949); Rector v. City & County of Denver, 122 P.3d 1010 (Colo.App.2005). The rule is a defense to claims asserting unjust enrichment. Apache Corp. v. Dynegy Midstream Servs., Ltd. P'ship, 214 S.W.3d 554, 565 (Tex.App. 2006). The rule "provides that where one makes a voluntary payment with knowledge of all relevant facts, and then sues to recover that payment, there generally can be no recovery, even if there was no legal liability to pay in the first place." Auto-Chlor Sys., Inc. v. JohnsonDiversey, 328 F.Supp.2d 980, 1011 (D.Minn.2004)(quoting Pratt v. Smart Corp., 968 S.W.2d 868, 871 (Tenn.Ct.App.1997)). However, the payor can defeat application of the rule by showing payment under protest or duress or a mistake as to all relevant facts. See Davis v. City & County of Denver, supra; Rector v. City & County of Denver, supra.
In ruling that the voluntary payment rule barred the developers' counterclaims, the trial court found as follows:
The reasons for the voluntary payment rule are evident in this case. Gallagher now seeks recovery of ASF fees voluntarily paid over a number of years. There is no evidence whatsoever that either Gallagher *128 or his predecessors in interest protested the fees at the time of payment. Had protest been made, plaintiffs would have been placed on notice of a legal challenge to the ASF fees and would have been afforded an opportunity to take remedial action. Allowing recovery of prior assessments that were not protested will impair plaintiffs' financial integrity, a burden that will ultimately be borne by all of their rate payers. Thus, the court finds that defendant Gallagher may not now recover previously paid ASF fees because the fees were paid voluntarily and without protest.
Because we have held that the developers' direct claims for unjust enrichment are compulsory counterclaims and are thus not barred by the statute of limitations, and because we have concluded that all assigned claims of the previous owners were barred by the statute of limitations, we limit our analysis to whether the developers' direct claims are barred by the voluntary payment rule. At issue, therefore, are the ASF payments made by the developers in October 2000 and February 2001 in order to convey the three units from Gallagher to Mountain West and to tap into the water and sewer system for development of those units.
The developers contend the trial court erred in applying the voluntary payment rule, because they protested and paid under duress and because their payments were mistakenly made without full knowledge of all relevant facts. We disagree.

1. Protest
We first reject the developers' contention that they paid under protest. Whether a payor has protested in writing is important in the assessment of the voluntary payment rule. Davis v. City & County of Denver, supra, 120 Colo. at 190, 207 P.2d at 1187 ("when a payment is made under protest and is the only means of obtaining a license to do business, or to continue therein, and when to attempt to do business without first complying with the provisions of the ordinance would subject one to drastic penalties, clearly such a payment is involuntary"). "[W]here the payor has an opportunity to dispute the payment, `the voluntariness in the doctrine goes to the willingness of a person to pay a bill without protest as to its correctness or legality.'" Rector v. City & County of Denver, supra, 122 P.3d at 1015 (quoting Putnam v. Time Warner Cable, Ltd. P'ship, 255 Wis.2d 447, 460, 649 N.W.2d 626, 633 (2002) (holding that payee should be entitled to rely on using its collected revenues where payor does not pay under protest)); see Regency Park, LP v. City of Topeka, 267 Kan. 465, 981 P.2d 256, 261 (1999) (requirement of a protest serves the important function of providing government with notice of a claimed tax illegality and affords government the chance to fashion its budget, taking into account the claim of illegality); G. Heileman Brewing Co. v. City of La Crosse, 105 Wis.2d 152, 312 N.W.2d 875, 880 (Ct.App.1981)(superseded by statute on another issue) (it is "desirable that government know when it contemplates spending public funds that those funds are either available or subject to loss through tax refund," and, therefore, the protest requirement is reasonable).
We conclude the record supports the trial court's finding that there is no evidence that the developers protested the fees at the time of payment. M.D.C./Wood, Inc. v. Mortimer, supra, 866 P.2d at 1383. Although the developers may have asked for explanations of the bills and argued with the districts' management about them, nothing in the record shows that they took the further step of paying the bills under a protest in writing. See Davis v. City & County of Denver, supra, 120 Colo. at 191, 207 P.2d at 1187 (protest endorsed upon one check for license fee was not voluntary payment, but a second check paid without protest was voluntary); Regency Park, L.P. v. City of Topeka, supra, 267 Kan. at 475, 981 P.2d at 263-64 (fees for sewer charges were subject to voluntary payment rule when plaintiffs complained about assessments but made no verbal or written statement that they intended to demand a refund). A written protest serves the important function of putting a governmental body on notice that it may be liable for a refund, and therefore verbal discussions disputing a bill with a member of a governmental body are insufficient to put the *129 government on notice of a protest as to the bill's legality. See Davis v. City & County of Denver, supra; Regency Park, L.P. v. City of Topeka, supra.

2. Duress
We also reject the developers' argument that they paid ASF under duress when Gallagher sold certain units to Mountain West to begin construction on that property.
The supreme court discussed duress in the context of the voluntary payment rule in Davis v. City & County of Denver, supra, 120 Colo. at 190-92, 207 P.2d at 1187. In Davis, the plaintiffs paid an invalid license fee to Denver in 1946 and 1947, and sought to recover those fees in an action against Denver. With respect to the 1946 payment (which was specifically paid under protest), the court determined that such payment was not voluntary because the plaintiffs were summoned to police court and faced with "drastic penalties" for not initially paying the license fee. Davis v. City & County of Denver, supra, 120 Colo. at 190, 207 P.2d at 1187. The court also noted that duress was present in connection with the 1946 payment, where the city demanded payment of the license fee and manifested an intention to enforce collection by prosecuting plaintiffs in police court. Davis v. City & County of Denver, supra, 120 Colo. at 190, 207 P.2d at 1187. However, with respect to the 1947 payment, where the city showed no intention of enforcing collection of the payment made for that year, and that payment was made without protest, the court found no evidence in the record to justify a finding that the payment was made under duress. Davis v. City & County of Denver, supra, 120 Colo. at 192, 207 P.2d at 1187; see Rector v. City & County of Denver, supra, 122 P.3d at 1015 (rejecting plaintiffs' argument that threats of a late fee, seizure of a vehicle, and additional impoundment, towing, and storage fees, exempted plaintiffs from the voluntary payment rule because payments of late fees were coerced). Similarly, here, the developers did not face any punitive sanctions when they paid ASF in October 2000 and February 2001, nor did they make these payments under protest at the time of payment.
The developers' reliance on Knutson Hotel Corp. v. City of Moorhead, 250 Minn. 392, 84 N.W.2d 626, 630 (1957), is misplaced. There, a hotel paid sewage disposal charges under a threat that the hotel's water would be turned off if it did not pay the outstanding bills. Here, however, there was no service to be terminated. Although penalties could have been imposed if the developers did not pay the outstanding ASF, the developers retained the ability to pay under protest and seek to recover any overcharges in a court action or administrative proceeding.
Similarly, we are not persuaded by the developers' reliance on Ball v. Village of Streamwood, 281 Ill.App.3d 679, 216 Ill.Dec. 251, 665 N.E.2d 311 (1996). In Ball, the plaintiffs had to choose between paying a municipality's real estate transfer tax and being unable to execute a contract to sell their property to a third party. Ball v. Village of Streamwood, supra, 216 Ill.Dec. at 258, 665 N.E.2d at 318. Here, the developers transferred the property among themselves, and other courses of action were open to them to effectuate the transfer and preserve their ability to seek reimbursement of any overcharges of ASF. See Mr. G's Turtle Mountain Lodge, Inc. v. Roland Twp., 651 N.W.2d 625 (N.D.2002) (payment to remove judgment lien to facilitate a pending sale of property was not made under duress, but rather was a voluntary payment because other courses of action were open to the judgment debtor, such as depositing funds with the clerk of the court or posting a supersedeas bond). For example, when transferring title to Unit No. 1 among themselves in January 2002, the developers deposited the contested fees in escrow in order to complete the sale. And, of course, the developers retained the ability to pay ASF under protest, which, the trial court found with record support, they never did. See Davis v. City & County of Denver, supra; Regency Park, L.P. v. City of Topeka, supra.
Accordingly, because the developers did not protest, and had courses of action open to them other than paying in full or being subject to enforcement, we perceive no duress.

*130 3. Mistake
We next consider whether the developers paid under a mistake that rendered their payments involuntary.
The voluntary payment rule distinguishes between payment of money based on a mistake of law and a mistake of fact. Money paid under mistake of fact may be recovered. Colo. Racing Comm'n v. Brush Racing Ass'n, 136 Colo. 279, 286, 316 P.2d 582, 586 (1957); Peterson v. McNichols, 128 Colo. 137, 143, 260 P.2d 938, 941 (1953)(allowing recovery under both mistakes of law and fact). Money paid under a mistake of law, which typically involves "a failure to appreciate the effect or consequences of a recognized law," cannot be recovered. Rector v. City & County of Denver, supra, 122 P.3d at 1014 (quoting Brookside Mem'ls, Inc. v. Barre City, 167 Vt. 558, 702 A.2d 47, 50 (1997)); see Prilliman v. City of Canon City, supra, 146 Colo. at 160, 360 P.2d at 812. But see San Antonio Indep. Sch. Dist. v. Nat'l Bank of Commerce, 626 S.W.2d 794, 796-97 (Tex.App.1981)(where bank paid a tax bill on an erroneously high property value, which was sent without valuation of properties taxed, the mistake was one of fact, and the voluntary payment rule did not apply).
We conclude that any mistake by the developers here was essentially a mistake of law relating to the proper statutory interpretation of ASF. See Rector v. City & County of Denver, supra. Therefore, the trial court did not err in determining the developers made voluntary payments and cannot recover under their counterclaims.
We reject the developers' reliance on Brookside Memorials, Inc. v. Barre City, supra, where the court held that a manufacturer seeking a refund for sewer bill overpayments was not subject to the voluntary payment rule, because it was a mistake of fact not to be aware of the city's flat tax rate for comparable businesses. There, the city's rates were published for different types of residences and businesses, and it was simply a factual error that caused the manufacturer to be overcharged. Here, in contrast, there was no misapprehension of an established fact. The calculation of ASF based on the pertinent statutes was, in our view, based on a matter of legal interpretation, and any mistake involved a failure to appreciate the effect of a recognized law. See Rector v. City & County of Denver, supra.
To the extent that the calculation of the number of units on which ASF was assessed was a mistake of fact, the record supports the trial court's finding that the developers were aware of this problem and nevertheless elected to pay ASF without protesting the assessment. Such payments made under those circumstances were not made by mistake, and the trial court did not err by concluding their counterclaims were barred by the voluntary payment rule. See Davis v. City & County of Denver, supra (license fee paid without protest a year after payor was aware that the pertinent ordinance might be unconstitutional was not recoverable); Restatement (Third) of Restitution & Unjust Enrichment §§ 6(2) cmt. e, 19(1) cmt. h (Tentative Draft No. 1, 2001). Indeed, the developers' claim that they made a mistake of fact about the accuracy of ASF charged by the districts and did not pay voluntarily is itself inconsistent with their claim that the payments were not voluntary because they protested by complaining that the bills were inaccurate.
Accordingly, we conclude the trial court correctly ruled that the developers' counterclaims for refund or credit of previously paid ASF were barred by the voluntary payment rule.

C. Unjust Enrichment
Because of our conclusions that the developers' claims for unjust enrichment were barred by the voluntary payment rule, and that their assigned claims from the previous owners were barred by the statute of limitations, we need not consider the developers' contention that they were entitled to judgment on the merits of their unjust enrichment claim.

VII. Spurious Lien Claim
The developers contend the trial court erred by ruling that their spurious lien counterclaim *131 was barred by the Colorado Governmental Immunity Act (CGIA). We disagree.
The CGIA grants governmental entities immunity from "all claims for injury which lie in tort or could lie in tort," with certain specific exceptions not relevant here. Section 24-10-106(1), C.R.S.2006. The CGIA provides governmental immunity from actions seeking compensatory damages for personal injuries suffered as a consequence of prohibited conduct. City of Colorado Springs v. Conners, 993 P.2d 1167, 1173 (Colo.2000); see Arabasz v. Schwartzberg, 943 P.2d 463, 465 (Colo.App.1996)(claim against city for estoppel based on a misrepresentation could lie in tort and was therefore barred by the CGIA). However, claims for noncompensatory relief aimed at redressing general harms do not lie in tort. City of Colorado Springs v. Conners, supra, 993 P.2d at 1176.
"[T]he question is not how the claim is characterized, but whether the claim is a tort claim or could be a tort claim." Arabasz v. Schwartzberg, supra, 943 P.2d at 465. A trial court determines whether an action is one for "injury which lies in tort or could lie in tort" under the CGIA by assessing whether the plaintiff seeks compensation for personal harms. City of Colorado Springs v. Conners, supra, 993 P.2d at 1176.
Here, the trial court found that the developers' spurious lien claim was akin to a claim for the tort of slander of title, and that, therefore, the claim was barred by the CGIA.
The developers contend that their spurious lien claim was a claim for noncompensatory relief aimed at redressing general harms, that the relief would not compensate them for personal injuries, and that, therefore, the claim cannot lie in tort. We are not persuaded.
The statute defining the elements of filing a spurious lien, § 38-35-109(3), C.R.S.2006, provides in pertinent part:
Any person who offers to have recorded or filed in the office of the county clerk and recorder any document purporting to convey, encumber, create a lien against, or otherwise affect the title to real property, knowing or having a reason to know that such document is forged or groundless, contains a material misstatement or false claim, or is otherwise invalid, shall be liable to the owner of such real property for the sum of not less than one thousand dollars or for actual damages caused thereby, whichever is greater, together with reasonable attorney fees.
The elements of the tort of slander of title are (1) slanderous words; (2) falsity; (3) malice; and (4) special damages. Hein Enters., Ltd. v. San Francisco Real Estate Investors, 720 P.2d 975, 980 (Colo. App.1985) (recording a void contract was sufficient to satisfy the requirements of slanderous words and falsity for slander of title claim). The existence of malice, which is an attempt to vex, annoy, or injure another party, is a question of fact. Hein Enters., Ltd. v. San Francisco Real Estate Investors, supra, 720 P.2d at 980.
Special damages involve some effect on the owner's ability to sell the property. McNichols v. Conejos-K Corp., 29 Colo. App. 205, 210, 482 P.2d 432, 435 (1971) ("In order to show that the words uttered have caused injury to the plaintiff, it is generally necessary to aver and show that they were uttered pending some treaty or public action for the sale of the property, and that thereby some intending purchaser was prevented from bidding or competing." (quoting Zimmerman v. Hinderlider, 105 Colo. 340, 348, 97 P.2d 443, 447 (1939))). At a minimum, the property must be on the market for sale, and the tort must create a cloud upon the title; then the expense of legal proceedings to remove the cloud on title satisfies the damages requirement. Fountain v. Mojo, 687 P.2d 496, 500-01 (Colo.App.1984) (improper filing of lis pendens can amount to tort of slander of title); see Salstrom v. Starke, 670 P.2d 809, 812 (Colo.App.1983) (special damages may involve additional costs and expenses incurred as a direct result of the inability to close a deal with a third party as a result of slander of title). Attorney fees and costs in removing the cloud on title also constitute special damages in a slander of title action. Hein Enters., Ltd. v. San Francisco Real Estate Investors, supra, 720 P.2d *132 at 981; Fountain v. Mojo, supra, 687 P.2d at 501.
In their spurious lien counterclaim, the developers asserted that the lien statements filed by the districts contained material misstatements and false claims as to the amounts due to the districts, the number of units to be used in the ASF calculation, the late fees, and other illegally imposed charges, and that the districts filed the notices and statements of lien with the knowledge, or having a reason to know, that the documents contained material misstatements and false claims. The counterclaim also requested actual damages caused by the districts' spurious liens or statutory damages of $1000, whichever was greater, as well as costs and reasonable attorney fees.
The developers' allegations of material misstatements of fact and false claims, if true, would fulfill the first two elements of the tort of slander of title, while the element of malice is a determination for the fact finder. The developers also requested damages for harm caused by the alleged cloud on their title as well as attorney fees for the expense of removing the cloud on their title. We view these claims as requesting compensation for personal harms. See City of Colorado Springs v. Conners, supra, 993 P.2d at 1176. The damage inflicted by a spurious lien is that it affects the alienability of the property.
Thus, we conclude the trial court did not err by ruling that the developers' spurious lien claim is sufficiently similar to the tort of slander of title and is, therefore, barred by the CGIA.

VIII. Supersedeas Bond
Because of our resolution of this matter, we need not address the districts' contention on cross-appeal that the trial court erred in approving a supersedeas bond that was secured by the property subject to the judgment in rem.

IX. Attorney Fees
The developers also contend that the trial court erred in awarding attorney fees and costs to the districts.
Because we reverse and remand that aspect of the judgment in favor of the districts ruling that the developers owed unpaid ASF and foreclosing the districts' liens, the award of attorney fees must likewise be reversed. See Am. Family Mut. Ins. Co. v. Centura HealthSt. Anthony Central Hosp., 46 P.3d 490, 495 (Colo.App.2002); Rossman v. Seasons at Tiara Rado Assocs., 943 P.2d 34, 38 (Colo.App.1996). Accordingly, we do not address the parties' various contentions regarding the trial court's award of attorney fees and costs, including whether attorney fees were precluded because the developers made an unconditional tender of payment.
That aspect of the judgment in favor of the districts, foreclosing their liens on their claim for unpaid ASF, late fees, and attorney fees is reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion. In all other respects, the judgment is affirmed.
Judge ROTHENBERG and JUDGE TERRY concur.